IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
V. ) Criminal No. 09-105
)
RUBEN MITCHELL )

## DEFENDANT'S MOTION IN OPPOSITION
## TO PRE-TRIAL DNA COLLECTION

Defendant, Ruben Mitchell, through his counsel, Assistant Federal Public Defender Elisa A. Long, moves this Court to deny the Government's request for the pre-trial collection of his DNA. In support of this Motion, Mr. Mitchell states the following:

## I.  INTRODUCTION AND RELEVANT BACKGROUND

On March 24, 2009, Ruben Mitchell was indicted on one count of attempt to possess with intent to distribute five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 846. Docket No. 1. Subsequently, on April 30, 2009, Mr. Mitchell appeared before Magistrate Judge Lisa P. Lenihan for an initial appearance. Docket No. 10. At that time, the Government requested a sample of Mr. Mitchell's DNA, citing as authority 28 C.F.R. § 28.12. Mr. Mitchell, through defense counsel, objected to the pre-trial collection of his DNA and asked for the opportunity to properly brief the issue. Accordingly, Magistrate Judge Lenihan Ordered that counsel file a Motion setting forth a basis for the objection and stayed the pre-trial collection of Mr. Mitchell's DNA "pending resolution by the District Court." Docket No. 14.

On May 8, 2009, prior to the Court's resolution of the DNA issue, Mr. Mitchell appeared before Magistrate Judge Lenihan for a detention hearing at the conclusion of which he was detained pending trial.  Docket No. 22.

As set forth below, Mr. Mitchell objects to the pre-trial collection of his DNA based upon his arrest or detention because the collection violates the protections afforded him under the Fourth Amendment to the United States Constitution.[1]  The collection of DNA is a search for Fourth Amendment purposes, and this warrantless, suspicionless search cannot excused under the "special needs" test or the "totality of the circumstances" test.  Additionally, Mr. Mitchell objects to the collection of his DNA because Congress has no authority under the Commerce Clause to regulate an individual's DNA.

## II.   DNA PROFILING[2] OF ARRESTEES VIOLATES THE FOURTH AMENDMENT.

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  The collection of an individual's DNA is

---

[1]   The purported authority for collecting an arrestee's DNA is found in 42 U.S.C. § 14135a(a)(1)(A) and its accompanying regulation, 28 C.F.R. § 28.12.  The purported authority exists for the collection of pre-trial DNA as a condition of "pre-trial release" under the Bail Reform Act, pursuant to 18 U.S.C. § 3142(b) & (c).  Authority also exists for the collection of DNA on the basis of a "conviction" pursuant to 42 U.S.C. § 14135a(a)(1)(A) & (B).  Because Mr. Mitchell has not been released nor has he been convicted, this brief will not address the constitutionality of the Bail Reform Act and 42 U.S.C. § 14135a(1).

[2]   As explained below, 42 U.S.C. §14135a(b) requires the collecting, analyzing, and storing of DNA samples, which is referred to as "DNA profiling" as shorthand.  See United States v. Kincade, 379 F.3d 813, 816 (9th Cir. 2004).

deemed a "search" for Fourth Amendment purposes.  See United States v. Sczubelek, 402 F.3d 175, 182 (3d Cir. 2005).  To determine whether such a search is permissible under the Fourth Amendment, it is assessed for reasonableness.  See id. "Reasonableness is usually established by satisfying the warrant requirement." Id. at 191 (McKee, J., dissenting).  However, in the event a search is conducted without a warrant, the search may still be deemed reasonable as there are certain, limited circumstances, where the warrant requirement may be excused.

In this case, the warrant requirement cannot be excused for arrestees or detainees under either the "special needs" test or "totality of the circumstances," recognized variations of Fourth Amendment analysis.  Therefore, the warrantless pre-trial collection of Mr. Mitchell's DNA is in violation of the Fourth Amendment and should be prohibited.

**A.   The DNA Profiling Statutory Regime Has Expanded to Include Arrestees and Detainees**.

In 2000, Congress passed the DNA Analysis Backlog Elimination Act ("DNA Act"), which required collection of DNA samples from individuals who were *convicted* of a "qualifying federal offense," who were in custody of the BOP, or released on parole or supervised release or on probation.  See 42 U.S.C. § 14135a (2000).  Since then, the Third Circuit has upheld the constitutionality of the DNA Act's requirement for the warrantless and suspicionless collection of DNA from those federal offenders who have been *convicted* and were on supervised release or probation.  See, e.g., Sczubelek, 402 F.3d 175 (supervised release); United States v. Hardy, 283 Fed.Appx. 84

(3d Cir. June 23, 2008)(probation).

By 2006, however, Congress had expanded the reach of the DNA Act to also include individuals who are "*arrested, facing charges*, or convicted." See 42 U.S.C. § 14135a(a)(1)(A)(emphasis added). This expansion did not take effect for several years as it was subject to the promulgation of regulations by the Attorney General. Id. The Attorney General's regulations went into effect on January 9, 2009. See 28 C.F.R. § 28.12. Three months later, the Government appeared in Court at Mr. Mitchell's initial appearance citing the regulation and asking the Court's permission to take a sample of Mr. Mitchell's DNA.

28 C.F.R. § 28.12 states that "[a]ny agency of the United States that arrests or detains individuals or supervises individuals facing charges shall collect DNA samples from individuals who are *arrested, facing charges*, or convicted." Id. (emphasis added). In sum, the DNA Act, coupled with the Attorney General's regulation, authorize the pre-trial collection of DNA from persons, like Mr. Mitchell, who have been merely *arrested* by a United States agency. In other words, the legislation no longer requires a conviction of a qualifying federal offense in order for the Government to obtain a sample of an individual's DNA.

To date, no Circuit Court of Appeals has addressed the constitutionality of the DNA Act's recent expansion to include arrested or detained individuals.

**B.   DNA Profiling Amounts To A Fourth Amendment Search.**

DNA profiling, which refers to the collecting, analyzing, an storing of DNA samples pursuant to 42 U.S.C. § 14135a(b),

amounts to a Fourth Amendment search in two ways.  First, the taking of the DNA sample is a search. Second, analyzing the DNA sample is a search.

      1.  <u>Collecting the DNA sample is a search</u>.

    The Department of Justice ("DOJ") statements indicate that DNA samples of arrestees will be taken via blood draws or buccal cheek swabs.  <u>See</u> DNA-Sample Collection and Biological Evidence Preservation in the Federal Jurisdiction, 73 Fed. Reg. 74932, 74935 (Dec. 10, 2008).  Either method of collection, whether it be by blood draw or buccal swab, is widely considered an invasion of privacy and deemed a search for Fourth Amendment purposes.  <u>See</u> <u>Sczubelek</u>, 402 F.3d at 182 (blood extraction for DNA is a search); <u>Friedman v. Boucher</u>, --- F.3d ----, 2009 WL 1758366, *2 (9th Cir. 2009)("There is no question that the buccal swab [DNA test] constituted a search under the Fourth Amendment."); <u>United States v. Kriesel</u>, 508 F.3d 941, 946 (9th Cir. 2007)("The compulsory extraction of blood for DNA profiling unquestionably implicates the right to personal security embodied in the Fourth Amendment, and thus constitutes a 'search' within the meaning of the Constitution."); <u>United States v. Weikert</u>, 504 F.3d 1, 6 (1st Cir. 2007)("[T]he extraction of blood for DNA profiling constitutes a search within the meaning of the Fourth Amendment."); <u>Nicholas v. Goord</u>, 430 F.3d 652, 656 n.5 (2d Cir. 2005)("[E]ven less intrusive measures of obtaining physiological data, such as cheek swabs, can constitute a search."); <u>Padgett v. Donald</u>, 401 F.3d 1273, 1277 (11th Cir.2005)(buccal swab DNA test is a Fourth Amendment search); <u>Schlicher v. Peters</u>, 103 F.3d 940, 942-43

(10th Cir. 1996)(collection of blood and saliva for DNA test is a search).

2.   Analyzing the DNA sample is a search.

Once a DNA sample is taken, it is analyzed. This too infringes on one's privacy interest and constitutes a search. See Sczubelek, 402 F.3d at 182 ("The ensuing chemical analysis of the [DNA] sample to obtain physiological data" is also a search covered by the Fourth Amendment")(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989)); Banks v. United States, 490 F.3d 1178, 1183 (10th Cir. 2007)(analyzing DNA sample from blood or saliva sample, must pass Fourth Amendment scrutiny); see also United States v. Kincade, 379 F.3d 813, 873 (9th Cir.2004)(en banc)("It is important to recognize that the Fourth Amendment intrusion here is not primarily the taking of the blood, but seizure of the DNA fingerprint and its inclusion in a searchable database")(Kozinski, C.J., dissenting).

As the legislative history of 42 U.S.C. § 14135a makes clear, the scope of information that can be obtained from a DNA sample is extraordinarily broad:

> The information obtainable from DNA testing surpasses any previous types of testing available. The amount of personal and private data contained in a DNA specimen provides insights into the most personal family relationships and the most intimate workings of the human body, including the likelihood of the occurrence of over 4,000 types of genetic conditions and diseases. Genetic information pertains not only to the individual whose DNA is sampled, but also to anyone who shares that bloodline.

H.R. Rep. 106-900(I) at 52 (Sept. 26, 2001). "DNA stores and reveals massive amounts of personal, private data about that

individual, and the advance of science promises to make stored DNA only more revealing in time." Kincade, 379 F.3d at 842 n.3 (Gould, J., concurring).

The invasion of privacy does not, however, end with its analysis.  Once analyzed and extracted, a DNA profile is loaded into the Combined DNA Index System ("CODIS"), a massive law enforcement database which "'allows state and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system.'"  Sczubelek, 402 F.3d at 182 (quoting H.R. Rep. 106-900(I), at 8 (2000)).  The DNA test results are disclosed to "'criminal justice agencies for law enforcement identification purposes,' for use 'in judicial proceedings,' and 'for criminal defense purposes, to a defendant.'"  Id. at 181-82 (quoting 42 U.S.C. § 14132(b)(3) and citing 42 U.S.C. § 14135e(b)).  The DNA profile remains in CODIS "permanently and can be continually accessed and searched."  Kriesel, 508 F.3d at 952 (Fletcher, J., dissenting).

Moreover, "[t]he problem with allowing the government to collect and maintain private information about the intimate details of our lives is that the bureaucracy most often in charge of the information is poorly regulated and susceptible to abuse."  Kincade, 379 F.3d at 843 (Reinhardt, J., dissenting) (quotation omitted); see United States v. Weikert, 421 F. Supp. 2d 259, 269 (D. Mass. 2006) ("[T]he dangers of government-controlled centralized databases have shown themselves to be quite real throughout recent history").  This

concern is heightened because the DOJ has indicated it intends to allow private contractors to take, test, and store DNA samples. <u>See</u> DNA-Sample Collection and Biological Evidence Preservation in the Federal Jurisdiction, 73 Fed. Reg. 74932, 74939 (Dec. 10, 2008); <u>see also</u> 42 U.S.C. § 14135a(a)(4)(B) (allowing officials to "enter into agreements with units of State or local government or with private entities to provide for the collection of the samples").

As explained above, the privacy intrusion in taking, analyzing, storing, and sharing an individual's DNA sample is significant and amounts to a Fourth Amendment search.

### C.   The Legality of the Search is Properly Analyzed Under the "Special Needs" Test.

"The fundamental task of any Fourth Amendment analysis is assessing the reasonableness of the government search." <u>Sczubelek</u>, 402 F.3d at 182 (citing <u>United States v. Knights</u>, 534 U.S. 112, 118 (2001)). "Reasonableness is usually established by satisfying the warrant requirement." <u>Id.</u> at 191 (McKee, J., dissenting). Because the Government has not sought a warrant based upon probable cause to conduct DNA profiling of Mr. Mitchell, it must satisfy one of the following two tests, both of which have been deemed "limited exceptions" to the Fourth Amendment's warrant requirement: 1) the "special needs" test; or 2) the "totality of the circumstances" test. In the case of arrestees or detainees, as is the case here, the Government's request for a DNA sample must be analyzed using the "special needs" test. Under that test, the search would not survive Fourth Amendment scrutiny and therefore the Government's request

should be denied.   Alternatively, the search cannot survive Fourth Amendment scrutiny under the "totality of the circumstances" test should the Court find that it applies in Mr. Mitchell's case.

      1.  The "Special Needs" and "Totality of the Circumstances" Tests.

The term "special needs" was first used in Justice Blackmun's concurrence in New Jersey v. T.L.O., 469 U.S. 325, 351 (1985), and refers to "[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."   Relying on that reasoning, the Supreme Court has held, in a variety of contexts, that the government need not comply with the probable cause and warrant requirements of the Fourth Amendment to conduct a search.   See, e.g., Board of Education v. Earls, 536 U.S. 822 (2002)(drug testing of students); Vernonia School District 47J v. Acton, 515 U.S. 646 (1995)(drug testing of students); National Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989)(drug testing of Customs employees with access to large quantities of drugs); Skinner, 489 U.S. 602 (drug testing of railroad employees).   In other contexts, the Supreme Court has found that the searches to be unreasonable - failing to pass muster under the "special needs" test.   See Chandler v. Miller, 520 U.S. 305 (1997)(the "special need" for drug-testing political candidates was not enough to over-ride individual's privacy interest); City of Indianapolis v. Edmond, 531 U.S. 32 (2000)(suspicionless searches conducted pursuant to vehicle checkpoint program to interdict unlawful

drugs did not fall under "special needs" exception - not beyond normal need for law enforcement); Ferguson v. City of Charleston, 532 U.S. 67 (2001)(hospital's policy of informing police that pregnant mother's tested positive for cocaine did not fall under "special needs" exception).

In one "special needs" case, Griffin v. Wisconsin, 483 U.S. 868 (1987), the Supreme Court upheld a warrantless search of a probationer's home. In doing so, the Court found a "special need" in the supervision of probationers that went beyond the normal need for law enforcement. See id. In Griffin, a probation officer received a tip from a police detective that a probationer might have guns in his home. See id. at 871. As such, the probation officer had reasonable suspicion to search, and, in addition, a state regulation authorized warrantless searches of probationers. See id. After receiving the tip, two probation officers, accompanied by three policemen, conducted a search of the home, and found a gun. See id. The probationer challenged the search on Fourth Amendment grounds, but the Supreme Court found the search lawful, relying on "special needs:"

> A state's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements.

Id. at 873.

In finding that the "supervision" of a probationer was a "special need beyond the normal need for law enforcement" the

Court in Griffin was careful to reiterate that a probation officer is not a "police officer who normally conducts searches against the ordinary citizen." Id. at 876. Griffin did, however, leave open the question whether warrantless searches of probationers by police officers were otherwise reasonable under the Fourth Amendment. See id. at 878, 880.

This question was answered affirmatively in Knights, 534 U.S. 112. Similar to the probationer in Griffin, the probationer in Knights was subjected to a warrantless search based upon reasonable suspicion. Id. The key difference was that in Knights the search was conducted solely by law enforcement officers. See id. at 116. Relying on Griffin, the probationer in Knights argued that the government must show the search satisfied the "special needs" test, but could not because the search was conducted for purely law enforcement - not probationary - purposes. See id. at 117. The Supreme Court rejected that argument, noting the question it left open in Griffin: whether, "special needs" aside, "warrantless searches of probationers were otherwise reasonable within the meaning of the Fourth Amendment." Id. at 117-18. The Court then applied a "totality of circumstances" test and held the search in Knights was reasonable under the Fourth Amendment. See id. at 118-21. Because Knights was a search based upon reasonable suspicion, it too, like Griffin, left open another question: whether a warrantless *and* suspicionless search of a conditional releasee would be permissible under the Fourth Amendment.

That question was also answered affirmatively in Samson v. California, 547 U.S. 843 (2006). In that case, a parolee was

stopped by a police officer, who had no particularized suspicion to search. See id. at 846-47. Nevertheless, relying on a state statute which authorized a warrantless search of a parolee, the officer searched the Samson and found methamphetamine. See id. Again, as in Knights, the Court applied a "totality of circumstances" test and held the search was reasonable - that a parolee had a diminished expectation of privacy and, in contrast, the state's interest in supervising parolees was substantial. See id. at 848-53.

In neither Knights nor Samson did the Supreme Court provide a clear explanation for its choice of a "totality of circumstances" test. However, the justification is clear: a convicted offender, on parole or probation, has suffered a constitutionally significant change in status such that the government may dispose of the warrant and probable cause (or any particularized suspicion) requirements. See Samson, 547 U.S. at 848, 550, 852 (noting that conditional releasees are on a "'continuum of state imposed punishments'" such that they do "not have an expectation of privacy that society would recognize as legitimate")(quoting Knights, 534 U.S. at 119)); Knights, 534 U.S. at 119 (conditional releasees "do not enjoy the absolute liberty to which every citizen is entitled")(quotations omitted).

2.   United States v. Sczubelek.

Applying the same approach as the Supreme Court in Knights and Samson, the Third Circuit in Sczubelek held that the suspicionless and warrantless collection of DNA from a conditional releasee does not violate the Fourth Amendment. See

Sczubelek, 402 F.3d at 187.  The Third Circuit in Sczubelek made two things clear about warrantless and suspicionless searches: (1) when directed at conditional releasees, such searches are reviewed under the "totality of circumstances" test; but (2) when directed at those not on conditional release, the "special needs" test applies.  Sczubelek, 402 F.3d at 184-87.

        a)    Sczubelek Made Clear that the "Totality of Circumstances" Test Applies to Warrantless and Suspicionless Searches of Conditional Releasees.

The Third Circuit's opinion in Sczubelek was filed in the interim between Knights and Samson.  However, relying on Knights and foreseeing the Supreme Court's subsequent holding in Samson, the majority held that it need not apply the "special needs" test given the degraded constitutional status of the conditional releasee in that case.   See Sczubelek, 402 F.3d at 184. Specifically, the majority concluded that, like the probationer in Knights, a supervised releasee (Mr. Sczubelek) "has a reduced right to privacy - and in particular to privacy of identity." Id.   After Mr. Sczubelek was convicted of a felony, "his identity became a matter of compelling interest to the government ... [which he] can no longer assert a privacy interest in these means of identification."   Id. at 185. Accordingly, the warrantless and suspicionless extraction of a DNA sample did not violate the Fourth Amendment.  Id. at 187.

        b)    Sczubelek Also Made Clear that the "Special Needs" Test Applies to Warrantless and Suspicionless Searches of Those Not on Conditional Release.

The majority in Sczubelek chose the Knights "totality of the circumstances" test over the Griffin "special needs" test because the "purpose for the collection of DNA goes well beyond the supervision by the Probation Office of an individual on supervised release." Id. at 184. That is, as a convicted offender, Sczubelek had a "reduced right to privacy-and in particular to privacy of identity ... [and] after his conviction of a felony, his identity became a matter of compelling interest to the government ... [as a] DNA database promotes increased accuracy in the investigation and prosecution of criminal cases." Id. at 184-85. The Third Circuit made clear that the conviction was the event that resulted in the diminished expectation of privacy: "After [Sczubelek's] conviction of a felony, his identity became a matter of compelling interest to the government." Id. at 184. It was on this basis that the Court held the totality of the circumstances test applies. See id. Therefore, it is implicit in this holding that the "special needs" test would apply when assessing the suspicionless and warrantless searches of an arrestee or detainee - i.e., one *not* on conditional release, one who had not been convicted, one who was presumed innocent. This point was emphasized when the Sczubelek Court held that the intrusion of a blood draw into an "*ordinary citizen's* privacy is unconstitutional," whereas "individuals on *supervised release*, like individuals on *probation*, 'do not enjoy the absolute liberty to which every citizen is entitled' ... for *criminal offenders* the privacy interests implicated by the collection of DNA are minimal." Id.

(quoting Knights, 534 U.S. at 119).  In other words, where the expectation of privacy is significantly reduced because of a conviction, the "totality of the circumstances" test applies. But, in the case of an "ordinary citizen" - i.e., other members of society including arrestees who enjoy a presumption of innocence - the "special needs" test applies.

This conclusion finds support in two opinions from the Ninth Circuit Court of Appeals.  The first is United States v. Scott, 450 F.3d 863, 872 (9th Cir. 2006), where an arrestee was subject to mandatory drug testing as a condition of pre-trial release, was arrested after submitting a dirty test, and an unregistered shotgun was found during a search incident to arrest.  See id. at 865.  The Ninth Circuit applied the "special needs" test and found that the warrantless search, including the drug test, required a showing of probable cause.  See id. at 868-72.  In choosing the "special needs" test, the court relied on the fact that "[p]eople released pending trial . . . have suffered no judicial abridgment of their constitutional rights." Id. at 872.  The court also noted that "common sense and case law" make clear the "constitutionally relevant distinction . . . between someone who has been convicted of a crime and someone who has been merely accused of a crime but is still presumed innocent . . ."  Id. at 873 (quotation and citation omitted); see also Kincade, 379 F.3d at 836 (noting "obvious and significant distinction between the DNA profiling of law-abiding citizens . . . and lawfully adjudicated criminals whose proven conduct substantially heightens the government's interest in monitoring them").

The second and more recent Ninth Circuit opinion is Friedman v. Boucher, --- F.3d ----, 2009 WL 1758366, in which a pretrial detainee brought a § 1983 action against law enforcement officials who forcibly took a sample of his DNA without a warrant or reasonable suspicion. See id. at *2. In that case, the Ninth Circuit applied the "special needs" test and held that the search was not permissible. That is, the court found that the government's only interest in taking the DNA sample was to solve "cold cases" and therefore was not an important non-law enforcement purpose.  See id. at *3. The Court also rejected the Government's reasonableness argument that "they have the inherent right, without a search warrant and without suspicion of criminal activity, to extract DNA forcibly from pre-trial detainees." Id. at *6. In rejecting that argument the Court stated:

> [N]either the Supreme Court nor this Court has ever ruled that law enforcement officers may conduct suspicionless searches on pretrial detainees for reasons other than prison security. Indeed, as the Supreme Court stated emphatically in Schmerber [v. California, 384 U.S. 757 (1966)]: "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." 384 U.S. at 769-70. In contrast to the government's position in this case, which would endorse routine, forcible DNA extraction, the Court concluded: "The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." Id. at 770.

Id. at *6.

Accordingly, as demonstrated above:   (1) because Mr.

Mitchell is not a convicted conditional releasee, with a consequent diminution of his constitutional status; and (2) because the Government is not seeking to proceed pursuant to the warrant clause of the Fourth Amendment, the government must show a "special need," aside from general law enforcement, to conduct DNA profiling.  As set out below, the government cannot make that showing.

> **D.    The Government Cannot Meet the "Special Needs" Test Because it Is Seeking to Conduct DNA Profiling for General Law Enforcement Purposes.**

In assessing whether the Government has met the "special needs" test, the Court must first assess whether there is a non-law enforcement purpose for the DNA profiling at issue.  If so, the Court then assesses whether the search is reasonable by balancing Mr. Mitchell's privacy interest against the government's "special need."  Compare Ferguson, 532 U.S. at 84 & n.21 (refusing to apply "a balancing test to determine Fourth Amendment reasonableness" because the search was undertaken to generate evidence for use by the police in enforcing general criminal laws); with Illinois v. Lidster, 540 U.S. 419, 423-27 (2004)(considering the balance of privacy interests versus governmental needs only after determining that the traffic stop in question "was not to determine whether [the individuals searched] were committing a crime, but to ask vehicle occupants, as members of the public, for their help").  Because the government's purpose here is related to general law enforcement, the Court need not address the balancing issue.

> 1.   <u>The "Special Needs" Exception Does Not Apply To Searches Undertaken For General Law Enforcement</u>

Purposes.

The special needs exception does not apply to gathering of evidence primarily for criminal investigatory purposes. See generally Ferguson, 532 U.S. at 84 (where the primary purpose of a program authorizing a suspicionless Fourth Amendment intrusion is the "general crime control ends" of governmental authorities, the program "simply does not fit within the closely guarded category of 'special needs'"). The Supreme Court has made clear that "'special needs'" are "concerns other than crime detection," Chandler, 520 U.S. at 314, and emphasized that point in holding the Fourth Amendment prohibits a public hospital from providing results of blood tests to police that showed expectant mothers had used drugs. See Ferguson, 532 U.S. 67. In doing so, the Court found such a statutorily required search regime did not fall within the "special needs" exception, even though the ultimate goal of the program was to get the women off drugs:

> Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate purpose. Such an approach is inconsistent with the Fourth Amendment.

Id. at 84 (footnote omitted).

Ferguson emphasized the "special needs" exception is narrow, and only applies when the "justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement." Id. at 74 n.7, 77, 79. Thus, "[t]he fact that positive tests results were

- 18 -

turned over to the police does not merely provide a basis for distinguishing [Supreme Court] prior cases applying the 'special needs' balancing approach to the determination of drug use.  It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment." Id. at 84.

Similarly, in Edmond, 531 U.S. 32, the Supreme Court rejected application of the "special needs" exception to "a highway checkpoint whose primary purpose is the discovery and interdiction of illegal narcotics." Id. at 34.  Analyzing the checkpoints at issue in Edmond, the Court was required to confront its previous opinions approving checkpoints designed to detect impaired drivers, see Michigan State Police Department v. Sitz, 496 U.S. 450 (1990), and undocumented immigrants, see United States v. Martinez-Fuerte, 428 U.S. 543 (1976).

Edmond ultimately concluded that "what principally distinguishes [the Indianapolis] checkpoints from those we have previously approved is their primary purpose." Edmond, 531 U.S. at 40.  Edmond made clear the Supreme Court never "indicate[d] approval of a checkpoint program whose primary purpose was to detect evidence of criminal wrongdoing." Id. at 37-38 (emphasis added).  Although it acknowledged that drug offenses pose a significant problem, as do drunken drivers, that alone cannot justify wide-ranging Fourth Amendment intrusions:

> [G]ravity of the threat alone cannot be
> dispositive of questions concerning what
> means law enforcement officers may employ to
> pursue a given purpose.   Rather, in
> determining whether individualized suspicion
> is required, we must consider the nature of
> the interests threatened and the connection
> to the particular law enforcement practices
> at issue.  We are particularly reluctant to

> recognize exceptions to the general rule of
> individualized    suspicion    where    the
> governmental authorities primarily pursue
> their general crime control ends.

Id. at 42-43.

That "reluctance" has informed the Supreme Court's special needs jurisprudence: "[i]n none of [the Court's] previous special needs cases [has it] upheld the collection of evidence for criminal law enforcement purposes." Ferguson, 532 U.S. at 83 n.20.   Justice Kennedy's concurrence in Ferguson perhaps states the principle most clearly: "[t]he traditional warrant and probable cause requirements are waived in our previous [special needs] cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes." Id. at 88 (Kennedy, J., concurring).

> 2.   The DNA Profiling Sought Here Is For General Law
>      Enforcement Purposes, And Thus Cannot Satisfy The
>      "Special Needs" Test.

Here, the DNA sample is drawn "for no other purpose than turning it over to law enforcement." Sczubelek, 402 F.3d 202 n. 20 (McKee, J., dissenting).   This is apparent for numerous reasons.   First, with respect to the statute itself:   (1) Congress ordered that the database be administered by the FBI, see 42 U.S.C. § 14132(a); (2) Congress ordered that the information stored be available to "criminal justice agencies," 42 U.S.C. § 14132(b)(3)(A); and (3) the title of section 14132 is, "Index to facilitate law enforcement exchange of DNA identification information."   See Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998)("the title of a statute and the

- 20 -

heading of a section are tools available for resolution of a doubt about the meaning of a statute") (quotation omitted).

The Department of Justice's remarks with respect to the regulations related to DNA profiling are also telling:

> Solving crimes by this means furthers the fundamental objectives of the criminal justice system, helping to bring the guilty to justice and protect the innocent, who might otherwise be wrongly suspected or accused, through the prompt and certain identification of the actual perpetrators. DNA analysis offers a critical complement to fingerprint analysis in the many cases in which perpetrators of crimes leave no recoverable fingerprint but leave biological residue at the crime scene.
>
> * * *
>
> [A]nalysis and database matching of a DNA sample collected from an arrestee may show that the arrestee's DNA matches DNA found in crime scene evidence from a murder, rape, or other serious crime.
>
> * * *
>
> By expanding CODIS pursuant to statutory authority to include persons arrested, facing charges, or convicted, and non-United States persons detained, this rule will enhance the accuracy and efficacy of the United States criminal justice system.

DNA-Sample Collection and Biological Evidence Preservation in the Federal Jurisdiction, 73 Fed. Reg. 74932, 74933-34 (Dec. 10, 2008). Relatedly, the FBI describes the CODIS database as "blend[ing] forensic science and computer technology into an effective tool for solving crime." See FBI CODIS Brochure (www.fbi.gov/hq/html/codisbrochure_text.htm). The FBI further explains:

> CODIS generates investigative leads in cases
> where biological evidence is recovered from
> the crime scene.   Matches made among
> profiles in the forensic index can link
> crime scenes together; possibly identifying
> serial offenders.   Based upon a match,
> police from multiple jurisdictions can
> coordinate their respective investigations
> and share the leads they developed
> independently.

Id.  Given the obvious general law enforcement purposes of DNA profiling of arrestees identified by Congress, DOJ, and the FBI, such profiling cannot satisfy the "special needs" test.

Notably, a 2006 article in the Journal of Law Medicine & Ethics assessed the constitutionality of Virginia and Louisiana statutes requiring testing of limited "categories of arrestees." After engaging in a wide-ranging survey of Supreme Court "special needs" precedent, the author, Professor Tracey Maclin, concluded:

> Under the existing Fourth Amendment doctrine
> of the Supreme Court, there is little doubt
> that the intrusions permitted by [Virginia
> and Louisiana statutes] constitute searches.
> And under the Court's special needs cases,
> a very strong argument can be made, based on
> the well-known purposes of these searches,
> that these procedures cannot be upheld as
> special needs searches unrelated to law
> enforcement interests.   Thus, if the Court
> were to address the constitutional validity
> of either or both of these statutes, an
> objective analysis of the statutes
> themselves, when combined with an objective
> reading of the Court's precedents, indicates
> the statutes should be declared
> unconstitutional.

Tracey Maclin, DNA Fingerprinting and Civil Liberty, 34 J.L. Med. & Ethics 165, 181 (2006).   The Attorney General of Tennessee appears to agree with Professor Maclin, having found

"constitutionally suspect" the DNA profiling of "persons arrested, but not yet convicted of violent felonies." Tenn. Op. Atty. Gen. No. 07-45, 2007 WL 1451632 (2007).

Accordingly, any DNA profiling of Mr. Mitchell is unconstitutional, and the defense asks that the Court issue an order preventing the government from collecting and analyzing Mr. Mitchell's DNA.  Unlike the defendant in <u>Sczubelek</u>, Mr. Mitchell is merely an arrestee, and an arrest may "happen[] to the innocent as well as to the guilty." <u>Michelson v. United States</u>, 335 U.S. 469, 482 (1948).  Therefore, because the DNA profiling of Mr. Mitchell cannot pass Fourth Amendment muster, the Court must prohibit it.

### III. THE DNA TESTING IS AN UNCONSTITUTIONAL EXTENSION OF FEDERAL POWER

#### A. The Commerce Clause Does Not Support the Collection of Mr. Mitchell's DNA.

A specific enumerated power must support every statute enacted by Congress. <u>See</u> <u>United States v. Morrison</u>, 529 U.S. 598, 607 (2000).  The Commerce Clause allows Congress "[t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl.3.  In <u>United States v. Lopez</u>, 514 U.S. 549, 558-59 (1995), the Supreme Court identified three categories of activities that Congress may regulate under its commerce power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect

interstate commerce.  <u>Accord</u> <u>Morrison</u>, 529 U.S. at 608-09.  Mr. Mitchell contends that section 14135a is facially unconstitutional because the collection of DNA mandated by the statute does not fit into any one of these three categories of permissible legislation, nor into any other enumerated power.

When originally enacted in 2000, Congress explicitly relied on the Commerce Clause as the basis for its DNA Backlog Elimination Act, which was limited to persons convicted of certain serious federal offenses.  While section 14135a initially limited its application to defendants convicted of at least one of the federal crimes set forth in a laundry list of qualifying offenses, the current version has strayed far from that limiting principle.

Because section 14135a now authorizes the collection of a DNA sample from individuals who are "arrested, facing charges, or convicted," the activity mandated by section 14135a has no connection to interstate commerce, nor to the federal government's power to regulate federal criminal cases.  The wording of this section, which was amended in 2006, extends broadly to all individuals who are arrested, facing charges, or convicted, without regard to whether they fall within any federal criminal jurisdiction.  This is an attempt to assert general police power over all individuals suspected of criminal conduct.  <u>See</u> <u>Morrison</u>, 529 U.S. at 618 ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims").

**B.    Congress Has No Power to Legislate DNA Profiling for**

**Arrestees, Criminal Defendants, and Persons Convicted of Crimes.**

In United States v. Hardy, 283 Fed.Appx. 84 (3d Cir. 2008), the Third Circuit, in non-precedential opinion, considered whether the previous, much narrower version of the DNA Act - which permitted collection of DNA from those *convicted* - was valid under the Commerce Clause. Indeed, the Hardy court held that Congress could regulate the release of the personal information contained in a convicted offender's DNA, as collected under the DNA Act. Hardy, 283 Fed.Appx. at 86.

In briefly analyzing the issue under Supreme Court precedent, the Third Circuit implicitly rejected the contention that Congress could act under the first and third categories of Commerce Clause power articulated in Lopez. The Court implied as much when it cited United States v. Reynard, 473 F.3d 1008 (9th Cir. 2007) and "agree[d] with [its] reasoning." Id. Reynard held that the "extraction of DNA and the subsequent inclusion of DNA data in the CODIS system" does not affect the "channels of interstate commerce" (first Lopez category) nor are they "intrastate activities of an economic nature that 'substantially affect' interstate commerce" (third Lopez category). Reynard, 473 F.3d at 1022. Rather, Reynard held that DNA was a "thing" in interstate commerce that could be regulated. Id. at 1023. In other words, the only possible Lopez ground for supporting DNA profiling was the second category: whether Congress is asserting its power to regulate an "instrumentality of interstate commerce and the persons or *things* in interstate commerce." Lopez, 514 U.S. at 558-59. In

apparent agreement, the Third Circuit in <u>Hardy</u> held "that the personal, identifying information contained in a DNA sample constitutes a "thing" in interstate commerce." <u>Hardy</u>, 283 Fed.Appx. at 86.  This rationale is, however, unpersuasive.

In contrast, Judge Pregerson in his dissent in <u>Reynard</u>, provides sound reasoning why a DNA sample is not a "thing" (second <u>Lopez</u> category) that can be regulated by Congress.  He states:

> [B]y passing the DNA Act, Congress is attempting to regulate something that it - and nobody else - has put into the stream of commerce. Reynard's DNA-while housed in his body - is not a "thing" in interstate commerce until the government, under the DNA Act, compels the DNA's extraction by drawing blood from a parolee and places the DNA in the stream of commerce for analysis. Congress may not bootstrap its authority to regulate purely local activity under the Commerce Clause. If the government is allowed to regulate anything that it puts into the stream of commerce, its powers under the Commerce Clause would be without limit. "To be sure, 'the power to regulate commerce, though broad indeed, has limits.' " <u>Citizens Bank v. Alafabco, Inc.</u>, 539 U.S. 52, 58, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (quoting <u>Maryland v. Wirtz</u>, 392 U.S. 183, 196, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)). ... [b]ecause passage of the DNA Act cannot be justified under any of the three "categories of regulation in which Congress is authorized to engage under its commerce power," [citation omitted] I agree with Reynard that passage of the DNA Act exceeds Congress's power under the Commerce Clause.

<u>Reynard</u>, 473 F.3d at 1024-25 (Pregerson, J. dissenting).  Judge Pregerson's dissent is  persuasive and consistent with previous Commerce Clause holdings- more so than the majority opinions in <u>Reynard</u> and <u>Hardy</u>.  Accordingly, Mr. Mitchell maintains that Congress has no authority to regulate his DNA in accordance with

42 U.S.C. § 14135a pursuant to the Commerce Clause or any other provision of law.

## IV.   CONCLUSION

Because 42 U.S.C. § 14135a and the related provisions in the Code of Federal Regulations are unconstitutional, the Court cannot impose require Mr. Mitchell to comply with DNA profiling. As such, this Court must issue an order preventing the government from collecting and analyzing Mr. Mitchell's DNA.

Respectfully submitted,

**/s/Elisa A. Long**
Elisa A. Long
Assistant Federal Public Defender